# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

**GWENDOLYN G. DUNIGAN**                                                           **PLAINTIFF**

**V.**                                **NO. 1:18CV00092 BRW/PSH**

**ANDREW SAUL,**
**Commissioner of Social Security Administration[1]**                  **DEFENDANT**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Billy Roy Wilson. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## I. Introduction:

Plaintiff, Gwendolyn G. Dunigan, applied for disability insurance benefits and supplemental security income benefits on November 10, 2015, alleging a disability onset date of June 4, 2015. (Tr. at 64). After conducting a hearing, the Administrative Law Judge ("ALJ") denied her application. (Tr. at 78). The Appeals Council denied Ms. Dunigan's request for review. (Tr. at 1). The ALJ's decision now stands as the final decision of the Commissioner. Ms. Dunigan has requested judicial review.

For the reasons stated below, this Court should reverse the ALJ's decision and remand for further review.

---

[1] On June 6, 2019, the United States Senate confirmed Mr. Saul's nomination to lead the Social Security Administration. Pursuant to Fed. R. Civ. P. 25(d), Mr. Saul is automatically substituted as the Defendant.

## II. The Commissioner's Decision:

The ALJ found that Ms. Dunigan had not engaged in substantial gainful activity since the alleged onset date of June 4, 2015. (Tr. at 67). At Step Two, the ALJ found that Ms. Dunigan has the following severe impairments: loss of visual acuity, seizures, diabetes, obesity, mini-strokes, degenerative disc disease of the lumbar spine, anxiety, and affective disorder. *Id.*

After finding that Ms. Dunigan's impairments did not meet or equal a listed impairment (Tr. at 67), the ALJ determined that Ms. Dunigan had the residual functional capacity ("RFC") to perform the full range of work at the sedentary level, except that: (1) she could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; (2) she could occasionally balance, stoop, crouch, and crawl; (3) she cannot work around unprotected heights or moving mechanical parts; (4) she cannot operate or drive a vehicle; (5) she can see, but must avoid jobs that require excellent vision; (6) she is limited to unskilled work, which means she is able to perform simple, routine, and repetitive tasks and make simple work-related decisions; and (6) she can work where interpersonal contact is incidental to the work performed and where supervision is simple, direct, and concrete.[2] (Tr. at 71).

The ALJ determined that Ms. Dunigan was not capable of performing any past relevant work. (Tr. at 76). Relying upon the testimony of the Vocational Expert ("VE") at Step Five, the ALJ found that, based on Ms. Dunigan's age, education, work experience and RFC, jobs existed in the national economy which she could perform, specifically document preparer and surveillance system monitor. (Tr. at 77). Consequently, the ALJ found that Ms. Dunigan was not disabled. *Id.*

---

[2] Sections (3) and (4) of the above RFC sentence represent some potential work hazards, but there are others, such as vibration, dangerous machinery, exposure to electric shock, and working with explosives or radiation, which the ALJ declined to include. See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"); *January v. Astrue*, 400 Fed. Appx. 929, 932 (5th Cir. 2010).

## III. <u>Discussion</u>:

    A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

    B. Ms. Dunigan's Arguments on Appeal

Ms. Dunigan contends that substantial evidence does not support the ALJ's decision to deny benefits. She argues generally that the ALJ did not fully consider all of her impairments in combination, and also, that the job of surveillance system monitor has evolved over the years such that she could not perform it as it is actually performed today. The Court agrees with Ms. Dunigan; the ALJ did not properly evaluate her impairments in combination, especially with respect to her

seizure disorder.

Ms. Dunigan was 5'9" and 300 pounds and she was 42 years old at the time of the hearing. (Tr. at 72, 115). She lived with her mother and teenage daughter and teenage son, who helped her perform activities of daily living. (Tr. 22, 410-417, 470-477).

Before November 2015, Ms. Dunigan complained of headaches, poor memory, shortness of breath, cardiac problems, back pain, anxiety and depression. She experienced some documented mini-strokes. (Tr. at 576-583, 1424-1429, 1523). On November 26, 2015, she had a grand mal seizure as reported to doctors at Fulton County ER by her mother. (Tr. at 417). Ms. Dunigan's mother said that she had heard Ms. Dunigan fall off her bed and found her having a grand mal seizure. (Tr. at 1200-1212). The intake doctor noted the 14 prescribed medications that Ms. Dunigan was taking for mental and physical problems, some of which were duplicates, and some of which lowered her seizure threshold. (Tr. at 1202). CT exams of the head showed areas of ischemia and stroke activity. *Id.* Diagnosis was breakthrough seizure with known seizure disorder. (Tr. at 1228). The doctor told Ms. Dunigan to decrease her medications and take her p.r.n. prescriptions as little as possible. *Id.*

On the same day, Ms. Dunigan went to the ER at UAMS. (Tr. at 647). She was having a grand mal seizure upon arrival at UAMS, with shaking, stiffening, partial responsiveness and confusion. (Tr. at 647). She stayed at Inpatient Neurology at UAMS for three days for seizure and stroke workup, monitored by neurologist Robert L. Archer, M.D. (Tr. at 651-659). Ms. Dunigan said she was taking Depakote and Keppra, which medications were not stopping her seizures. (Tr. at 651). Keppra was discontinued and she was started on zonisamide.[3] (Tr. at 647-651). A cVEEG

---

[3] Ms. Dunigan testified at the hearing that she was taking the highest dose possible of her seizure

4

showed she was having epileptic and non-epileptic events.⁴ (Tr. at 659). Dr. Archer said her stroke history contributed to her seizures. (Tr. at 659-660). He prohibited her from driving, swimming, or bathing in a bathtub. *Id.*

For the rest of 2015, Ms. Dunigan suffered stress-related anxiety and depression, compounded by headaches, back pain, chest pain, insomnia, and manic symptoms. (Tr. at 1315-1351, 1690-1699, 1523-1531). She said she did not know when a seizure would occur, or what triggered it. (Tr. at 112). Her driver's license had been revoked due to seizures, and she was depressed about not being able to work or help her family around the house. (Tr. at 1523). She said she would certainly work if she was able to.⁵ (Tr. at 45).

On February 15, 2016, Ms. Dunigan reported to Salem Medical Clinic after having a clonic seizure. (Tr. at 1361-1369). Her mother found her lying on the ground in the front yard. (Tr. at 1369). Upon examination at the Clinic, Ms. Dunigan developed a blank stare, started crying, and began seizing. (Tr. at 1373). She was disoriented upon mental status examination. *Id.*

In August 2016, Ms. Dunigan saw Dr. Krishna Mylavarapu, M.D., a neurologist, for treatment of her seizures. (Tr. at 1607-1610). She said her seizures were occurring 3-4 times per day. *Id*. They involved jerking, trembling, eyes rolling back in her head, clenching of the mouth, and loss of bladder control. *Id*. Ms. Dunigan said she now has to wear adult diapers and her teenage daughter has to change her diapers for her, which embarrasses her. (Tr. at 115-117). While neurological examination was normal, Dr. Mylavarapu thought she was having focal seizures.⁶

---

medications. (Tr. at 116-117).
⁴ Several subsequent EEGs were relatively normal. (Tr. at 1615-1618).
⁵ In spite of only a ninth-grade education, she had a long work history of management positions. (Tr. at 106-111).
⁶ The ALJ cited to several relatively normal clinical neurological exams. (Tr. at 73-74).

(Tr. at 1609-1614). An MRI of the brain identified subacute left frontal and parietal lobe infarcts compatible with laminar necrosis. *Id*.

On September 28, 2016, Ms. Dunigan's mother reported to Dr. Mylavarapu that she had a seizure that morning where she was unresponsive for two minutes. (Tr. at 1615-1618). Her mother also said she had a seizure two weeks prior where she was unable to open her mouth for five minutes. *Id*. Dr. Mylavarapu noted that EEGS had been grossly normal, but he strongly suspected that the seizures had a functional etiology.[7] He told Ms. Dunigan not to drive. *Id*.

Ms. Dunigan reported multiple falls in December 2016 which were attributed to over-sedation from her numerous medications as well as her seizure disorder. (Tr. at 1571-1591).

Ms. Dunigan also testified that she had a seizure while in her attorney's office, which he confirmed. (Tr. at 125)

There is an unsigned and undated form called Treating Physician Report for Seizure Disorder in the record, indicating that Ms. Dunigan experienced 10 seizures per week and 20 in the last year. (Tr. at 951-952). The ALJ questioned Ms. Dunigan's attorney about the document at the hearing, asking the attorney who had filled out the form. (Tr. at 113-114). Ms. Dunigan's attorney stated that it was part of the neurology records, but because it was unsigned and undated, the ALJ gave the report no weight. (Tr. at 75, 113-114).

The two-state medical consultants gave controlling weight to the report of the inpatient

---

[7] Several doctors could not explain the root cause of Ms. Dunigan's seizures, noting relatively normal objective tests, but they still diagnosed Ms. Dunigan with seizures; this correlates to Dr. Mylavarapu's suggestion that she had "functional etiology." Functional neurologic disorders are "a newer and broader term that includes what some people call conversion disorder, and they feature nervous system (neurological) symptoms that can't be explained by a neurological disease or other medical condition. However, the symptoms are real and cause significant distress or problems functioning." https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197

neurologist and assigned Ms. Dunigan an RFC for sedentary work with exposure to *No Hazards*. (Tr. at 202-204, 251-252). The ALJ gave these opinions partial weight. (Tr. at 74). The RFC prohibited work involving only three hazards. (Tr. at 71).

The ALJ made little mention of Ms. Dunigan's seizure disorder. She downplayed Ms. Dunigan's seizures, asserting that she was not always compliant with her medications. (Tr. at 72-75). Actually, there are numerous notes from doctors saying she was compliant with medications and her pill counts were accurate. (Tr. at 88-97, 112). She took 14 or more medications as prescribed, some of which made her problems worse. (Tr. at 1228, 1614). While Ms. Dunigan was overweight, her therapist noted in 2018 that she was intentionally losing weight, in accordance with medical advice. (Tr. at 37). The Court notes that while she smoked for many years, she reported in 2018 that she had quit smoking per doctor's orders. (Tr.at 22).

The ALJ also stated that Ms. Dunigan could perform daily activities like caring for herself and her mother on occasion. (Tr. at 70-75). But in the disability function report, filled out by Ms. Dunigan's mother, she said she needed help from her mother and children for almost everything. (Tr. at 410-416).

Ms. Dunigan brought her teenage children to the hearing to testify about her seizures. The ALJ declined to question them. (Tr. at 126-131). They subsequently submitted statements that said they had witnessed many seizures, that Ms. Dunigan soiled herself during seizures, that they had to carry her to bed, and that she could not take care of things at home like she used to. (Tr. at 475-477). Ms. Dunigan's daughter said she had to stay up late or stay home from school to take care of her, and she was scared about losing her mother. *Id*. These statements corroborate Ms. Dunigan's reports of seizure symptoms and correspond to the medical evidence, and the ALJ said

7

she did consider them, but she did not describe what weight she gave them. (Tr. at 75).

The ALJ had plenty of evidence before her relating to Ms. Dunigan's limitations from her severe seizure disorder. She did not discuss much of it, and she did not use any dates of treatment to correspond to the medical evidence she cited. The chronology in her opinion is therefore unclear. (Tr. at 70-76). The ALJ did not address the two neurologists' conclusions, or mention Ms. Dunigan's inpatient neurology treatment.[8] A district court case from South Dakota contained similar issues as those in this case, where a claimant had multiple impairments, including seizures. *Gronbeck v. Schweiker*, 534 F. Supp. 642 (D.S.D. 1982). The court in *Gronbeck* reversed the ALJ, finding that the ALJ failed to fully account for the claimant's seizure disorder which caused episodic mild and severe seizures, was not controlled by medication, caused detrimental side effects, caused blackouts while driving, and which seizures were of uncertain etiology. *Gronbeck*, 534 F. Supp. at 645-647. The ALJ's discussion of the claimant's impairments in *Gronbeck* was minimal and he did not consider the effect of all of the impairments in combination, so reversal was required. *Id.*

The ALJ in this case did not order a consultative examination, which would have been appropriate if the ALJ had any doubts about Ms. Dungian's credibility, or found the medical opinions to be inconsistent. *See Dornseif v. Astrue*, 499 Fed. Appx. 598 (7th Cir. 2013)(claimant testified that she had seizures three times a week, but given conflicting evidence of frequency and severity, the ALJ should have ordered a consultative physical examination). Unlike in *Dornseif,* the medical opinions in this case *are* in agreement, and the record as a whole conclusively supports

---

[8] In records submitted after the hearing, it is clear than Ms. Dunigan treated with a third neurologist in 2018. (Tr. at 20).

that Ms. Dunigan is severely limited by her seizures. Thus, if the ALJ questioned the medical evidence of seizures, it was even more important for her to order a consultative examination,.

As noted above, Ms. Dunigan was on the highest dose of medication possible for seizures, and some of her medication was actually making seizures more likely. The ALJ did not account for this. *See Figueroa v. Secretary of Health, Education & Welfare*, 585 F.2d 551, 554 (1st Cir. 1978)(court reversed and remanded where ALJ did not account for unusually large dosing for seizure prevention; ALJ should have further developed the record).

The ALJ also did not give good reasons for choosing not to assign an RFC requiring no exposure to *any hazards*, as the state doctors suggested. The RFC assigned by the ALJ just listed three workplace hazards. (Tr. at 71). Nothing contradicted the reviewing doctors' opinions about workplace hazards. Still, the ALJ gave those opinions only partial weight, and the RFC reflected it.

Finally, when Ms. Dunigan's attorney asked the VE if any jobs would be available for a person who had a grand mal seizure once a month, the VE said no. (Tr. at 130-131). The evidence lends support to this hypothetical posed by the attorney, because Ms. Dunigan had debilitating seizures regularly, in spite of high doses of medication, that required emergency treatment by specialists.

## IV. <u>Conclusion</u>:

For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence. The ALJ did not fully consider or discuss the effects of Ms. Dunigan's seizure disorder, and she should have further developed the record.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REVERSED and the case be REMANDED for further review.

DATED this 26th day of November, 2019.

_____
UNITED STATES MAGISTRATE JUDGE